**In re Gabriel QUILES, Maria Quiles, Debtors.**

No. 00–10028.

United States Bankruptcy Court, D. Rhode Island.

March 26, 2001.

Peter G. Berman, Raskin & Berman, Providence, Rhode Island, for debtors.

John Boyajian, Boyajian, Harrington & Richardson, Providence, Rhode Island, Chapter 13 Trustee.

### DECISION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Heard on the Chapter 13 Trustee's Objection to confirmation of the Debtors' Chapter 13 plan. At issue is whether the Court should confirm a Chapter 13 plan that: (1) provides for no payments within the plan to any creditors; (2) strips off a wholly unsecured second mortgage on the Debtors' primary residence; and (3) maintains ongoing payments to the first mortgage holder outside the plan. The Chapter 13 Trustee objects on the ground that the plan is not proposed in good faith and does not provide for payment of all of the Debtors' projected disposable income into the plan for a period of three years, in violation of 11 U.S.C. § 1325(b)(1)(B). For the reasons set forth below, confirmation is DENIED.

### BACKGROUND

■ Phase I of this classic "Chapter 20"[1] casearted on August 27, 1999, when the Debtors filed a voluntary Chapter 7 petition, telling us under oath that: (1) the Debtors' primary residence was located at 106 Pine Hill Avenue, Johnston, Rhode Island, valued at $109,000; (2) the property was encumbered by a first mortgage to Norwest Mortgage in the amount of $80,095, and a second mortgage to Cityscape in the amount of $36,946; (3) they had $21,786 of unsecured debt, mostly credit card obligations; (4) they had total monthly income of $3,127, and expenses of $3,648; and that (5) they had no bank accounts within the year preceding the bankruptcy filing. *See* Trustee's Ex. 1, Chapter 7 Bankruptcy Petition and Schedules, BK No. 99–13279. On October 9, 1999, the Chapter 7 Trustee filed a "no asset" report, on December 2, 1999 the Debtors received their discharge, unsecured creditors received nothing, and on December 13, 1999, the case was closed.

About three weeks later, on January 5, 2000, with no showing, or even an allegation of a change in circumstances, the Debtors filed a petition under Chapter 13, using essentially the same schedules as the ones used in their recent Chapter 7 case. The information contained in the second filing is identical to the Debtors' Chapter 7 schedules, with the exception of the Chapter 13 Schedule F, which stated, of course, that now there are no creditors holding unsecured claims.

In early February 2000, the Debtors filed their Chapter 13 plan, together with a motion to strip the lien of Cityscape, the second mortgage holder on the Debtors' principal residence. This time, however, the Debtors set the market value of the property at $88,300 and the balance due the first mortgagee, Norwest, at $109, 000. It really strains credulity to try and reconcile this information with the Debtors' Chapter 13 Schedules A and D, which state that the value of the home is $109,000 and the balance due Norwest is $80,095. The Chapter 13 plan called for payments of $100 per month for 36 months, notwithstanding the Debtors' Schedules I and J which show that they had no money to fund a plan and, in fact, faced a monthly shortfall of $521.

---

1. "Chapter 20" is a generally negative term applied where a Debtor files a Chapter 7 case, discharges all of his/her dischargeable Chapter 7 debts, then files a Chapter 13 case to obtain the expanded Chapter 13 discharge, or to strip down or strip off secured debt through a plan that pays little or nothing to undersecured creditors.

Apparently recognizing the hurdles to confirmation and strip off with the Schedules as filed, the Debtors filed a motion to amend Schedules A and D to change the value of the property to $88,300 and the balance of the Norwest mortgage to $109,000. The Debtors also filed Amended Schedules I and J, reducing their expenses to show net disposable income of $115 per month. On March 31, the Debtors also filed their First Amended Plan which called for payments of $60 per month over 36 months. As the hearing date approached, the Debtors again agreed that confirmation should be denied, and on April 21, 2000, it was so ordered. On April 28, 2000, the Debtors filed a Second Amended Plan which was simply a rerun of the prior plan, and again, confirmation was denied by agreement of the parties.

On May 19, 2000, the Debtors filed their Third Amended Plan, together with a motion to strip the lien of the second mortgage holder, Litton Loan Servicing, the successor-in-interest to Cityscape. Funding under the Third Amended Plan is described as follows: "The plan call [sic] for a payment of the mortgage to be made outside of the plan and for the stripping of a lien on real estate which is wholly unsecured and for which the underlying debt was discharged in a previous chapter 7." Third Amended Plan, Docket No. 31. This time, the motion to strip the lien sets the value of the Debtors' home at $80,000 at the time of filing, and the first mortgage balance due Norwest at $82,000.

In their Third Amended Plan the Debtors propose to strip off the second mortgage of $36,000, and they offer no plan payments, notwithstanding that they show net disposable income of $115 per month. *See* Amended Schedules I & J, Docket No. 18. The Debtors argue simplistically that no plan payments are required because there are no creditors to pay, i.e., they are current on their first mortgage, they have no unsecured or priority creditors, and their personal liability on their second mortgage has been discharged in the prior Chapter 7. The Debtor even suggests that in her opinion it would be a violation of the discharge injunction issued in the prior Chapter 7 case if she proposed a plan that paid anything to the undersecured second mortgage holder.

The Chapter 13 Trustee argues that the Debtors' plan is an abuse of the process, in violation of the aim of Chapter 13, and that if the Debtors wanted to achieve the benefit of a strip off, they should have followed the good faith route of filing a Chapter 13 case in the beginning, using at least some of their net disposable income to pay unsecured and undersecured creditors.

Maria Quiles has attempted to explain away the inconsistencies in her various filings regarding the value of her home and the balances owed on the first and second mortgages, claiming that she gave her attorney the correct information and relied completely on her to do things properly. She says she signed the petition and schedules as presented to her, without really reviewing them, because of the trust she had in her counsel. When confronted with her admission at the 341 meeting that she in fact had a checking account and that this information contradicted her bankruptcy schedules both in the instant case and the prior Chapter 7, where she stated that she had no bank accounts within the year preceding bankruptcy, she again blamed her lawyer, and said that she would have signed the petition and schedules, regardless of what they said, because she trusted her attorney, who was there to protect her interest. Totally belying all of her testimony on this issue, and damaging her credibility generally, is the fact that Ms. Quiles has worked in a law office as a

paralegal for the past 11 years, *specializing in the preparation of Chapter 7 cases.*

## DISCUSSION

■ Confirmation is governed by Section 1325(a), and in considering whether to confirm a plan the Court must find that the plan satisfies all six requirements of the statute, including that "the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3).[2]

■ This Court recently held that: Notwithstanding the absence of any objection to confirmation, the Court has an independent duty to determine that the plan meets all Code requirements. *See* 11 U.S.C. § 1325(a)(1); *In re Jewell,* 75 B.R. 318, 319 (Bankr.S.D.Ohio 1987). One essential prerequisite to confirmation is that the plan be proposed in "good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3). A number of factors are relevant in determining whether this requirement has been met, including:

> "the terms of the Chapter 13 plan including the dividend offered to creditors, whether the plan represents a sincerely intended commitment to pay back creditors, and whether the financial status of the debtors justifies the special protection offered by the provisions of Chapter 13."

*In re Jewell,* 75 B.R. at 319–20 (*quoting In re Breckenridge,* 12 B.R. 159, 160 (Bankr.S.D.Ohio 1980)).

Providing creditors with a dividend equal to what they would receive in a Chapter 7 liquidation is not per se satisfaction of the good faith requirement, nor is the offer of a really small dividend tantamount to bad faith, per se. *See Jewell,* 75 B.R. at 320. Proposing a very low dividend, however, "subjects the plan provisions to greater scrutiny on those issues." *Id.* (citation omitted).

As a matter of policy, however, the proponent of a zero dividend plan assumes the heavy burden of showing that the offer does not contradict the intent and purpose of Chapter 13. The legislative history to the Bankruptcy Reform Act of 1978 states in part that:

> The purpose of chapter 13 is to enable an individual, under court supervision and protection, to develop and perform under a plan for the repayment of his [/her] debts over an

---

2. The statute provides that a court shall confirm a plan if:

(1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;

(2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;

(3) the plan has been proposed in good faith and not by any means forbidden by law;

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B) (i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder; and

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

11 U.S.C. § 1325(a).

extended period. In some cases, the plan will call for full repayment. In others, it may offer creditors a percentage of their claims in full settlement. . . . The benefit to the debtor of developing a plan of repayment under chapter 13, rather than opting for liquidation under chapter 7, is that it permits the debtor to protect his[/her] assets. . . . Under chapter 13, the debtor may retain his[/her] property by agreeing to repay his[/her] creditors. . . . The benefit to the creditors is self-evident: their losses will be significantly less than if their debtors opt for straight bankruptcy.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 118, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6079.

*In re Farmer*, 186 B.R. 781, 782–83 (Bankr.D.R.I.1995); *See also In re Keach*, 225 B.R. 264 (Bankr.D.R.I.1998) (where we adopted a totality of circumstances standard for determining if a Chapter 13 plan is proposed in good faith).[3]

▆▆▆▆ The Debtors readily admit that, as they have no creditors, the only purpose of the Chapter 13 filing is to strip off the unsecured second mortgage. To confirm a plan on these facts would be antithetical to one of the basic purposes of Chapter 13, which is to propose, where possible, a plan to pay back creditors.

These Debtors seek only the benefits of Chapter 13, and they shun all the burdens.

In addition, as the case droned on with her improbable proposals, Mrs. Quiles created insurmountable credibility problems for herself. The Debtors amended Schedules A, D, I and J, only *after* inconsistencies were called to their attention, and after they failed to get this information right in their prior Chapter 7,[4] and have filed two motions to strip liens containing information inconsistent with their sworn schedules. Under cross examination by the Chapter 13 Trustee, Mrs. Quiles admitted that she had not made a payment on the second mortgage for at least 5 months before filing her Chapter 7 petition, yet she listed these payments as a "current expense" on Schedule J in both the Chapter 7 and the Chapter 13 filings. On March 3, 2000, Mrs. Quiles testified at the Section 341 meeting that she did not receive the Chapter 13 Trustee's letter dated January 6, 2000 (Exhibit # 3), which reminds debtors of their obligation to make proposed plan payments within thirty days of filing the plan. (*See* Supplement of Record, Docket No. 36). Now she states that she received the letter—it was just misplaced at the time of the 341 meeting. Mrs. Quiles also testified at the Section 341 meeting that she had a bank account (*see id.*), yet none of the Chapter 7

---

**3.** The debtor in *Keach* also filed a succession of Chapter 13 plans. *See In re Keach*, 234 B.R. 236 (Bankr.D.R.I.1999) (*Keach II*). On appeal the First Circuit Bankruptcy Appellate Panel reversed, *see In re Keach*, 243 B.R. 851 (1st Cir. BAP 2000), stating that in determining whether the Chapter 13 plan was proposed in good faith, the bankruptcy court *should not have considered* the debtor's prefiling conduct (i.e., that he had a prior Chapter 7 on the heels of the Chapter 13, that the only Chapter 13 creditor was a defrauded person whose debt was determined nondischargeable in the prior Chapter 7, that the debtor was paying only a minimal dividend to creditors, and was not accounting for all of

his disposable income). *Id.* at 869–70. The BAP stated that the good faith inquiry should focus "only to the honesty of the debtor's postfiling conduct." *Id.* at 868. Although I sincerely disagree with the BAP's rationale and conclusion in *Keach*, it makes no difference here, because even under that Panel's view, Quiles's plan clearly fails the test of the "honesty of the debtor's postfiling conduct," by a long shot.

**4.** The Debtors essentially borrowed their Chapter 7 schedules for the instant filing, apparently never reading them for accuracy.

or Chapter 13 papers disclose any ownership interest in bank accounts. When confronted with these omissions, she cavalierly and consistently blames her attorney. Even in ordinary circumstances, debtors totally unfamiliar with the bankruptcy process are bound by the actions of their attorneys. *Link v. Wabash R. Co.*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). Here, a paralegal with eleven years of experience in bankruptcy should be and is held to an even higher standard than "ordinary debtors." [5]

Based upon the entire record, including that: (1) on the heels of a Chapter 7 case wherein they discharged all of their unsecured debt, the Debtors have filed a Chapter 13 petition disingenuously claiming they now have no creditors to pay; (2) notwithstanding their ability to do so, the Debtors have made no provision in the plan for the second mortgage holder; [6] (3) the Debtors' schedules and motions to strip lien continue to be replete with inconsistencies; and (4) Maria Quiles's testimony is not credible; I find that the plan is not proposed in good faith as required under 11 U.S.C. § 1325(a)(3). Accordingly, confirmation of the Third Amended Plan is DENIED, with prejudice.

Enter Judgment consistent with this opinion.

---

[5]. Even under the "ordinary debtor" standard, however, Quiles has not shown any entitlement to relief, by blaming her attorney for virtually every inconsistency. The bottom line is that Quiles is simply not a believable witness.

[6]. While it is not necessary to decide the issue for purposes of this decision, I disagree with the Debtors' position that the second mortgage holder is not a creditor. *See Johnson v. Home State Bank*, 501 U.S. 78, 84, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) (holding that "we have no trouble concluding that a mortgage interest that survives the discharge of a debtor's personal liability is a 'claim' within the terms of 101(5)").